CJF8.4.20



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Julie D. Podlesni*
*Special Assistant United States Attorney*
*Julie.Podlesni@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT  410-209-4941*
*MAIN    410-209-4800*
*FAX     410-962-0122*

February 16, 2021

**VIA E-MAIL/ECF**
Hon. Stephanie A. Gallagher
United States District Judge
Edward A. Garmatz United States Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

      Re:    *United States v. Jimmy Harper*, Criminal No. SAG-19-0520

Dear Judge Gallagher:

      I write in advance of the sentencing hearing for Defendant Jimmy Harper, currently scheduled for February 18, 2021, to set forth the Government's reasons that a sentence of 90 months' imprisonment is warranted under 18 U.S.C. § 3553(a). While the Government recognizes Harper's prompt acceptance of responsibility, the severity of the instant offense when coupled with his history and characteristics, compel the conclusion that a sentence at the top of the agreed-upon range (90 months) is the only sufficient way to satisfy the goals embodied in § 3553(a).

**I.    FACTS AND PROCEDURAL HISTORY**

      In July 2019, the Baltimore Police Department ("BPD") began investigating a drug shop operating in the 400 block of Robert Street that was so high-volume it engendered numerous civilian complaints. Having gained an initial understanding of how the shop operated, on July 17, 2019, the officers assumed covert position to surveil and commence an operation to interrupt the shop. As a long line of customers queued up to purchase, Harper exited from the rear of the basement apartment of 1920 Eutaw Place carrying a black bag that appeared heavy and approached a man later identified as Thomas Kent. Harper opened the bag to allow Kent to remove several clear plastic bags from it. Kent then walked to the rear of 1838 McCulloh Street, followed by the long line of customers, to begin distribution. When officers moved to apprehend Harper, Kent, and their customers, Harper and Kent fled, and the officers briefly lost Harper. When they located him shortly thereafter, he refused their command to stop and began fleeing again, and officers were forced to tackle him to take him into custody. When they searched his person, they recovered from an otherwise unsecured position in his waistband a Smith & Wesson M&P 40 semi-automatic pistol loaded with six rounds, including one in the chamber. From his pockets, they also recovered 124 gelcaps of a mixture or substance containing fentanyl and acetyl fentanyl and cash consistent with the proceeds of drug trafficking. Much more significantly, because he had no longer been carrying the black bag when they arrested him, they canvassed his flight path and observed, in a

vacant dwelling believed to serve as the stash house, a black plastic bag containing 20 clear plastic bags with 25 gelcaps each inside and a floor completely covered with hundreds of empty black bags and clear plastic bags that matched those observed by officers and recovered from Harper (as to the clear bags).

The BPD Drug Analysis Unit analyzed all the gelcaps recovered, determined that the net weight of the mixture from the gelcaps recovered from Harper's person alone was approximately 35.47 grams, with almost *five times* that amount (approximately 175.75 grams) being found in the bag recovered from the stash house.

The shop was too profitable to stop operating, though, and the very next day, the officers arrested the shop's supplier, Bernard Carolina, and searched the Eutaw Place address from whence Harper emerged the morning of his own arrest. Carolina likewise tried to flee and threw the bag of drugs he had on him, but those drugs were recovered and found to total another 500 gelcaps. The subsequent search of the apartment and building yielded, among other items, a duffel another 2000 gelcaps (for a total approximate weight recovered that day of almost 700 grams, all packaged in a manner identical to those recovered from Harper and the vacant stash house the day before) and two additional firearms. Lest one think this was coincidental, Harper is heard discussing both Carolina's arrest and the search of the Eutaw Place address on recorded jail calls.

On November 5, 2019, the Grand Jury returned a three-count indictment as to Harper, and on September 18, 2020, Defendant pleaded guilty to Counts 1 and 2 of that indictment, charging him with violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 18 U.S.C. § 924(c)(1)(A) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime)

## II.     GUIDELINES COMPUTATIONS

Harper's base offense level as to Count 1 is 26, because it involved at least 10 grams of a substance containing fentanyl or an analogue (which weight does not include the drug recovered from the vacant stash house). PSR ¶ 17. With adjustments for acceptance of responsibility, the total offense level reduces to 23. Id. ¶ 25. Count 2 carries a mandatory minimum term of imprisonment of 60 months to be served consecutive to Count 1. ¶ 26. Harper's Criminal History Category is III, based on 4 criminal history points. Id. ¶ 40. Thus, the Guidelines range is 117 to 131 months.

## III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Although the Guidelines recommend 117 to 131 months, the Government took note of Harper's prompt acceptance of responsibility and relatively dated criminal history and offered a plea to a lower range, though noting consistently that it believed the very top of the range was the appropriate sentence under § 3553(a). Every § 3553(a) hews in favor of a more severe sentence.

### A. Nature, Circumstances, and Seriousness of the Offense and Protecting the Public

This offense is extremely serious and dangerous. Not only was Harper an integral member of a high-volume drug shop pumping lethal acetyl fentanyl in the community, he was doing so while armed. Further, not only was he armed, but his weapon actually had a round chambered. He even ran from the police numerous times, despite multiple directives to stop, with that active firearm relatively unsecured in his waistband. It is through providence alone that neither he nor the officers, to say nothing of bystanders, were hit from an accidental discharge from that firearm when the officers were forced to tackle him to subdue him.

Further, the Court must look at the overall scope of the instant offense, including the nature of the shop, the volume of drugs recovered from the vacant stash house, and the fact that an enormous volume of identical drugs (along with two guns) were recovered from the same place from which Harper emerged the day of his arrest. This was not a one-off incident; Harper was serving as an integral member of a high-volume, armed drug shop, with all the violence that attends such an operation in Baltimore city.

### B. History and Characteristics of the Defendant

This offense also must be viewed in light of the Harper's criminal history, which, though dated, includes *three* prior drug felonies. Again, the Government took the age of Harper's criminal history into account in making a below guidelines offer, but that lengthy history also shows that this is the trade that Harper practices and must be taken into account. Further, he is not a mere "nonviolent drug offender," as is so often argued: he has not one, but two prior convictions for assaultive behavior. Finally, while Harper has noted that he was not on probation or parole at the time of the instant offense, neither had he been successful on either, with at least three previous violations in his record, for one of which he was sentenced to six years' incarceration. Further, it is not as though that status was of long standing: his parole had expired just the year before. PSR ¶ 38.

### C. Deterrence

Finally, Harper's conduct here demonstrates a genuine need for deterrence. Not only was he engaging in high-volume and dangerous drug trafficking, but he was doing so while armed and after numerous convictions for drug felonies and violent behavior. In fact, for at least one of those convictions, he received a substantial suspended sentence of approximately fourteen years, and he *still* violated that probation, resulting in a sentence on that violation of six years. The Government is asking for a sentence of 90 months (7.5 years), which term is eminently reasonable in attempting to deter future violations given his current conduct, his history, and the previous terms of incarceration that did not have the desired effect. Harper was completely undeterred by his history, and the recommended sentence aims to address that behavior.

## IV.     CONCLUSION

In light of those factors, the Government believes 90 months' imprisonment is sufficient but not greater than necessary to accomplish the purposes of § 3553(a).

Very truly yours,

Jonathan Lenzner
Acting United States Attorney

_____/s/_____
Julie D. Podlesni
Jeffrey M. Hann
Special Assistant United States Attorneys

cc:     Jeffrey Dahlberg, Esq.
Paige Cameron, U.S. Probation Officer